## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**v.**                            **CIVIL ACTION NO.**  3:20-cv-00050

**APPROXIMATELY $29,781.79 SEIZED FROM
HUNTINGTON FEDERAL SAVINGS BANK
ACCOUNT NUMBER ENDING IN 4743
AND ACCOUNT NUMBER ENDING IN 1317;**

**APPROXIMATELY $9,627.27 SEIZED FROM
WESBANCO BANK ACCOUNT NUMBER
ENDING IN 2878;**

**APPROXIMATELY $1,606,353.51 SEIZED
FROM SUNTRUST BANK ACCOUNT NUMBER
ENDING IN 6498 AT SUNTRUST BANK;**

**AND**

**APPROXIMATELY $114,826.67 SEIZED
FROM J.P. MORGAN CHASE BANK ACCOUNT
NUMBER ENDING IN 5372.**

     **Defendants.**

## VERIFIED COMPLAINT OF FORFEITURE

Comes now, the United States of America ("Plaintiff"), by and through its attorneys,

Michael B. Stuart, United States Attorney for the Southern District of West Virginia, and Kathleen

Robeson, Assistant United States Attorney for the Southern District of West Virginia, and

respectfully brings this Verified Complaint (the "Complaint") and alleges as follows in accordance

with Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and to the extent applicable 18 U.S.C. §§ 981, 983, 984, and 985, and the Federal Rules of Civil Procedure.

## NATURE OF ACTION

1.    This is a civil action in rem brought on behalf of the United States of America, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), to enforce the provisions for the forfeiture of defendant properties, constituting proceeds of, or which was used or intended to be used in any manner or part to commit or to facilitate the commission of one or more violations of 18 U.S.C. §§ 1028A, 1341, 1343, 1344 and 1956-1957.

2.    This action seeks forfeiture of all right, title and interest in the above-captioned funds (hereinafter, collectively referred to as the "Subject Funds") because these funds constitute or are derived from proceeds of aggravated identity theft, mail, wire, and bank fraud in violation of 18 U.S.C. §§ 1028A, 1341, 1343, and 1344.  The properties also are involved in monetary transactions in violation of 18 U.S.C. §§ 1956-1957.  The Subject Funds total to approximately $1,760,589.24.  As set forth more fully below, numerous individuals perpetuated a global fraud scheme and deposited the fraudulent proceeds into bank accounts owned by Patricia Dudding.

3.    Patricia Dudding then engaged in numerous transactions in violation of the money laundering laws as she worked to conceal the true ownership of the Subject Funds and then knowingly engaged in multiple transfers or withdrawals of the illicit proceeds.

## JURISDICTION AND VENUE

4.    Plaintiff brings this action in rem in its own right to forfeit and condemn the defendant property.  This Court has jurisdiction over an action commenced by the United States under

2

28 U.S.C. § 1345 and § 1355(a) because this forfeiture action has been commenced by the United States.

5. This Court has *in rem* jurisdiction pursuant to: (1) 28 U.S.C. § 1355(b)(1)(A), because acts and omissions giving rise to the forfeiture occurred in this district; and (2) 28 U.S.C. § 1355(b)(1)(B), incorporating 28 U.S.C. § 1395, because the property is located within this district.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), because the acts or omission giving rise to the forfeiture occurred in this district.

## STATUTORY BACKGROUND

7. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting a "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), or any conspiracy to commit any such violation, is forfeitable to the United States.

8. Pursuant to 18 U.S.C. § 1956(c)(7)(A), the definition of a specific unlawful activity includes any act or activity constituting an offense listed in 18 U.S.C. § 1961(1).

9. 18 U.S.C. § 1961(1)(B) lists mail fraud in violation of 18 U.S.C. § 1341, as well as wire fraud in violation of 18 U.S.C. § 1343, and bank fraud in violation of 18 U.S.C. § 1344 as specified unlawful activities.

10. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, which was involved in money laundering transactions or attempted transactions in violation of 18 U.S.C. §§ 1956-1957, and property traceable to such property is forfeitable to the United States.

## THE DEFENDANTS IN REM

11.     The defendants in rem constitute or are derived from proceeds traceable to the violations

of 18 U.S.C. §§ 1028A, 1341, 1343, 1344, 1956, and 1957, described herein and

therefore are subject to civil judicial forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

Each item requested for forfeiture is more particularly described below.  The defendants

in rem are collectively referred to as the Subject Funds.

   a.   Approximately $29,781.79 seized from personal account number ending in 4743

and personal account number ending in 1317.  Both accounts were held at

Huntington Federal Savings Bank, opened on October 18, 2018, the authorized

signor being Patricia Dudding and/or Roger Dudding, (hereinafter referred to as

"SUM A").

   b.   Approximately $9,627.27 seized from personal account number ending in 2878

at Wesbanco Bank, opened August 9, 2013, the authorized signor being Patricia

Dudding, (hereinafter, referred to as "SUM B").

   c.   Approximately $1,606,353.51 seized from personal account number ending in

6498 at SunTrust Bank, the authorized signor being Patricia Dudding

(hereinafter, referred to as "SUM C").

   d.   Approximately $114,826.67 seized from personal account number ending in

5372 in J.P. Morgan Chase Bank, the authorized signor being Patricia Dudding

(hereinafter, referred to as "SUM D").

12.     The Subject Funds were seized pursuant to seizure warrants, which were issued by the

United States District Court for the Southern District of West Virginia.  The United States

Department of Treasury is currently holding the Subject Funds.

4

13.     Pursuant to Supplemental Rule G(2)(f), facts in support of a reasonable belief that the Government will be able to meet its burden of proof at trial are as follows and have been verified by the attached Verification of Secret Service Special Agent Terry Hedrick.

## FACTS

### *Scheme Overview*

14.     From on or about May 2018 until at least July 2019[1], Patricia Dudding and Susan Grooms were involved in an international wire fraud, mail fraud, bank fraud and money-laundering scheme with an individual believed to be from Nigeria, known as Lucas, and others located in the United States.[2]

15.     The loss amount attributed to the fraudulent scheme is at least $3.2 million, but further investigation may reveal that the loss amount is much higher than $3.2 million and that $3.2 million is a conservative figure.

16.     As a result of the fraud associated with this scheme victims have been identified in Alaska, Arizona, Arkansas, California, Connecticut, Florida, Georgia, Indiana, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, North Carolina, Pennsylvania, Texas and Virginia, as well as in the countries of Australia, Canada, Poland, Sweden and Saint Kitts and Nevis.

---

[1] The United States believes that several of the conspirators may still be involved in this international fraud scheme.

[2] Investigators believe that Lucas used other alias in his dealings with many other victims in this investigation.

5

17.     Dudding, Grooms and Lucas worked together, and with others both known and unknown, in orchestrating this large international fraud scheme, and illegally obtaining money from individuals located both within the United States and abroad.

18.     Dudding and Grooms acted as "money mules" for Lucas, meaning that numerous victims funneled money to Dudding, and Grooms' (hereinafter, collectively referred to as the "money mules") bank accounts, at Lucas' direction.

19.     According to Dudding and Grooms, Lucas gave their personal bank account numbers to each of the victims who wire transferred money into their personal bank accounts or mailed cash, personal checks or Cashier's checks to the money mules, which they deposited into their personal bank accounts.

20.     Victims also sent these funds to the money mules' bank accounts via Western Union, Money Gram, Stripe,[3]and Square Inc.[4]

21.     After the deposit of the funds in the Dudding and Grooms' accounts, the money mules would then transfer these funds to Nigerian companies, such as Keibler Couture Global Ltd., whose bank account is located in Nigeria.  Dudding and Grooms also transferred large sums of money between themselves and other money mules during the scheme.

---

[3] Stripe is a type of software that allows individuals to make and receive payments over the Internet. Stripe provides the technical, fraud prevention, and banking infrastructure required to operate online payment systems.

[4] Square is a type of software that allows individuals to make and receive payments from their mobile devices. Square provides the technical, fraud prevention, and banking infrastructure required to operate online payment systems.

*Patricia Dudding*[5]

22.   In the early spring of 2018, Dudding met a man online who said his name was Lucas Antonio Blantino or Benito (hereinafter, "Lucas").[6] Dudding admitted that she became emotionally attached to Lucas, but never met him in person.

23.   Lucas and Dudding communicated frequently from early spring of 2018 until at least July 30, 2019, either online or through text messages.

24.   Lucas advised Dudding he worked on an oil rig.  Sometime in early 2018 or mid-summer 2018, Lucas told Dudding he was moving temporarily to the United Kingdom to work on an oil rig on a major project.  He told Dudding a major piece of equipment he owned broke down and he did not have the funds to make the repairs.  However, Lucas never asked Dudding for any money from her personally.  Instead, Lucas told Dudding he was going to borrow money from an Africa financier.

25.   Lucas then asked Dudding to set up numerous bank accounts in her name, at different banks including People's Bank, Branch Banking & Trust ("BB&T"), City National Bank, SunTrust Bank, Community Trust Bank, JP Morgan Chase Bank, First State Bank, United Bank, WesBanco, and Huntington Federal Savings Bank.

26.   Dudding then received numerous deposits from at least 23 different individuals located domestically and abroad in the bank accounts that she either opened or held on Lucas'

---

[5] Dudding held several positions within the banking industry, including, working in the loan department of United Bank.  Dudding left United Bank in 2004.

[6] It is not known if this is the subject's real name; however, this is the name the subject used during the entire period he corresponded with Dudding.  Law enforcement believes that the same individual purporting to be Lucas, is the individual that Susan Grooms knows as Andy Mario ("Mario").

behalf.  Dudding informed law enforcement that she never spoke with or met any of the individuals who either transferred money into her bank accounts or sent her checks or cash which she deposited into her bank accounts.  Dudding elaborated that she never communicated via email or text message with any of these individuals.

27. Dudding advised she did not always look at her monthly bank statements.  Instead, she made sure there was enough money in her bank account for the wire transfers and other disbursements that Lucas directed.  However, Dudding informed investigators that when she did look at her bank statements she would see wire transfers into her bank account from people all over the United States.  When Dudding asked Lucas who these people were Lucas would always tell Dudding they were people who were investing money with his (Lucas') financier in Nigeria.

28. Lucas would contact Dudding to tell her how much money he was going to have deposited into her account.  Each time after Lucas would have wire transfers and checks sent to her personal bank accounts, Lucas would also tell her when to send a wire transfer to Nigeria or make other disbursements.

29. Sometimes bank officials questioned Dudding about the incoming wire transfers and her outgoing wire transfers to Nigeria.

30. Dudding admitted that when she was questioned about the wire transfers she would lie to the bank officials.

31. After Dudding sent numerous wire transfers to Nigeria, numerous banks, including BB&T, People's Bank and United Bank, closed Dudding's accounts due to suspected fraudulent activity at Lucas' direction.

32.  However, after a bank would close Duddings' account, she would simply open a new account at another bank.

33.  For example, investigators learned that after BB&T closed Dudding's BB&T account, a bank employee told Dudding she was a part of a scam.

34.  After officials at BB&T closed her account, Lucas started instructing victims to make deposits into Dudding's People's Bank account. People's Bank ultimately closed Dudding's account as well and informed her that she was being used as part of a scam.

35.  Around August of 2018, Dudding opened up an account at Chase Bank, pursuant to Lucas' instructions.  Dudding stated Lucas made many deposits into her account at Chase Bank and she sent a large number of wire transfers to Keibler Couture Global Ltd. from this Chase Bank account.

36.  Lucas would contact Dudding to tell her how much money he was going to have deposited into her account and when to send a wire transfer to Nigeria or make other disbursements. Dudding again claimed that she did not know the source of the deposits.

37.  In the spring of 2019, Dudding received a letter from Chase Bank wherein she was advised the bank was closing her account for suspected fraudulent activity and that funds within her account were frozen.

38.  On January 11, 2019, United Bank's Fraud Department was alerted about unusual activity within Dudding's account. The Fraud Department contacted Dudding, who said that her cousin "Brenda" relocated to the United Kingdom in the summer of 2018. Dudding elaborated that Brenda's husband Lucas works in oil and gas investments and that the transactions within her accounts were done for Lucas's associates in the industry.

9

39.    Dudding opened a checking account with Community Trust Bank in April 2019. Dudding was questioned by a bank employee regarding a Stripe payment for $30,269.99 that was pending in her account.  When questioned, Dudding lied to the employee and stated that her cousin is building a gas station in England and is sending her these funds so she can send them to another relative in California to purchase equipment for him. Community Trust Bank personnel then told Dudding that the activity seemed suspicious.

40.    On April 26, 2019, Dudding sent a wire transfer from her First State Bank account to Known Person 1 in Montana for $39,000.  Investigators learned that a First State Bank employee spoke to Dudding about this wire transfer and Dudding informed the bank employee that the woman (Known Person 1) receiving this money works with Dudding's cousin in real estate and she has dealt with her in the past and trusts her, which is false.

41.    In or around July of 2019, Dudding admitted to investigators that the money in her accounts was not her money.

### Susan Grooms

42.    Investigators analyzed Dudding's bank account information and learned that there had been multiple financial transactions between Dudding and Grooms.  Specifically, Grooms made at least two transfers into Dudding's Chase bank account that was frozen by J.P. Morgan Chase.   The wire transfers were as follows: $38,500.00 transferred on March 13, 2019 and $19,100.00 transferred on March 20, 2019.

43.    Chase Bank prevented three of the transfers into Dudding's account.  However, it appears that the $38,500 transfer from March 13, 2019 was completed and those funds are part of the Subject Funds.

44. Grooms voluntarily admitted to investigators that she had sent approximately $200,000 to Dudding's bank account at the direction of Andy Mario (hereinafter, "Mario") over time. Grooms also admitted that she had sent transfers to Dudding that Chase placed a hold on. She estimates these four transfers totaled $96,000. According to Grooms, the last transfer occurred in April or May of 2019.

45. Grooms showed investigators, a photo of Mario on her phone and let Special Agent Hedrick copy Andy Mario's photo. Upon investigators' examination, it appears that the photo of Mario is the same photograph of Lucas that Dudding showed investigators. Investigators believed that the same individual is purporting to be both Mario and Lucas.

46. Grooms further explained to investigators that she met Mario about two years ago from an online dating website. When asked how much of her own money she had given Mario, Grooms estimated she had given him about $4,000. When Grooms first met Mario, he was allegedly living in California. Shortly after they started to communicate online, Mario told Grooms he was moving to England to work on a $1,000,000 pipeline job for a hospital. Shortly after Mario allegedly went to England, he told Grooms that some of his equipment had broken down and he needed money to repair the equipment or replace the equipment.

47. Grooms never met Mario in person. But, Grooms claims she spoke to Mario on the phone or through text or email almost every day. On many days, they communicated several times a day.

48. Mario asked Grooms if he could have some people wire transfer money into her bank account and then have her wire transfer the money to other people, who would then wire transfer the money to his financier so he would have the funds needed to repair or replace his equipment. Grooms asked Mario why he just did not have these people to wire transfer

the money straight to his bank account in England.  According to Grooms, Mario explained that he did not have a company bank account or a personal bank account in England. Grooms stated she thought that was odd, but Mario convinced her to allow people to wire transfer money into her account. She would then transfer the money to others.  Mario always contacted Grooms when he directed someone wire transfer money into her account.

49.   Grooms held numerous bank accounts at least eight different banks, including JP Morgan Chase Bank, Huntington National Bank, Incenta Credit Union, Union Savings Bank, Universal 1 Credit Union, Wright-Patt Credit Union, US Bank, and Woodforest Bank, over the past two years. Grooms admitted that many of the banks had closed her accounts because the wire transfers and deposits into her accounts came from individuals located across the United States.  She also admitted that numerous bank officials (from different banks) advised her that the activity in and out of her bank accounts was very unusual and that the bank officials advised her that they believed the wire transfers into her account were illegal proceeds and that they had seen similar schemes where money was transferred to Nigeria.

50.   Grooms received wire transfers or checks from several individuals across the United States.  Grooms admitted that she never communicated with or met any of the people she received money from, or any of her wire transfer recipients.  Instead, Grooms claimed that she was simply following Mario's instructions.

51.   Grooms sent money via wire transfers and checks to Dudding and Known Person 1.

52.   Grooms, due to her being self-employed, does not draw a retirement check, other than Social Security.  She does receive a retirement check from her ex-husband's employer.

### *Victim Information*

53.  Multiple individuals transferred money to the money mules' bank accounts. Examples of victims who spoke to investigators and portions of the information that investigators learned from the victims are described below.

54.  Victim A advised investigators that on May 23, 2018, she became a Facebook friend of a Christopher Kevin Lucas at his request. Investigators believe that Christopher Kevin Lucas is the same person that Dudding dealt with – Lucas, also known as Lucas Antonio Blantino or Benito. Victim A advised she and Lucas began chatting, and he seemed like a really nice guy. Lucas told Victim A that he had a twelve-year old daughter named Eva. According to Lucas, Eva's mother died from an automobile accident ten years before. A month or so after Victim A and Lucas became acquainted, Lucas informed Victim A that he would be going to India to supervise a construction job with Liang Corporation, a company headquartered in China. Victim A and Lucas communicated through Gmail hangouts, a messaging service with Gmail. In July of 2018, Lucas asked Victim A to send him money because his company required him to come back to the United States to sign papers to activate his personal bank account earmarked for the construction job with Capital One Bank. Victim A stated that every time Lucas considered making the trip back to the States something would come up to hinder him. Lucas continued to request more money from Victim A and always promised to repay her in full.

55.  According to Victim A, she last transferred funds to Lucas on May 23, 2019.

56.  Victim A sent Dudding a wire transfer of $28,000 on or about December 26, 2018. Victim A sent Known Person 2 a cashier's check for $55,000 on November 19, 2018 and Victim

A also sent Known Person 2 $47,000 on November 26, 2018.  The investigation has revealed that Known Person 2 sent at least two financial transfers to Grooms.

57. Victim B sent $5,000.00 to Dudding.  Victim B stated he did not know Dudding personally, but that he was attempting to get an investment license for a company in England.  Victim B told investigators that his contact was Mr. Thomas David Mark, with Eldorado Cacique Holdings LLC (investigators believe that Thomas Mark and Lucas are the same individual).  Victim B explained that he gave Dudding a $5,000.00 Cashier's Check on November 27, 2018 as directed by Mr. Mark.  Furthermore, Mr. Mark represented Dudding as an accountant for his company.  Victim B informed law enforcement that he transferred money to other people, but never received his license as promised.

## FINANCIAL ANALYSIS

58. Investigators analyzed Dudding's known personal bank accounts.  The funds deposited into these bank accounts Dudding used in the international scheme included very little legitimate funds.  The financial analysis revealed numerous transfers made by Dudding among the accounts Dudding used in this scheme.  For example, Dudding would transfer illegal funds deposited into one account into another one of her (Dudding's) bank accounts so that she could make the various Nigerian wire transfers.  The summaries below do not include victims' funds deposited into Known Person 1 or Susan Grooms' bank accounts nor do these summaries include the amounts of money Known Person 1, or Grooms sent to Nigeria.

59.   **Wire Transfers:** Incoming wire transfers into Dudding's personal bank accounts from victims in this international scheme during the years 2018 through June 2019 totaled at least $2,684,133.57.  These incoming wire transfers are summarized below by bank:

| Bank | Incoming Wire Transfers Amounts |
|------|----------------------------------|
| Sun Trust | $1,992,422.57 |
| BB&T | $    11,400.00 |
| JP Morgan Chase | $  644,711.00 |
| United Bank | $    26,300.00 |
| First State Bank | $       9,300.00 |
| Totals | $2,684,133.57 |

60.   **Victim's Checks:** In addition, numerous checks from victims were deposited into Dudding's personal bank accounts.  These deposits of checks totaled at least $592,157 during 2018 and through June 2019.  The victim's checks deposited into Dudding's bank accounts are summarized below:

| Bank | Victim Checks Deposited - Amounts |
|------|------------------------------------|
| Sun Trust | $  60,390 |
| BB&T | $  17,711 |
| JP Morgan Chase | $ 348,500 |
| Huntington Federal  Savings Bank | $  12,000 |
| United Bank | $  51,000 |
| Totals | $ 489,601 |

61.   **Payments Received from Stripe Inc. and Square One Inc.:**

62.   In addition, Dudding received $153,950 from victims through Stripe Inc., a mobile payment processing company.  Dudding also received $1,429.32 from victims through Square Inc. during this same time period.  Square Inc. is another mobile payment processing company.  The payments Dudding received from victims in this scheme from Stripe Inc. and Square One Inc. are summarized below:

| Bank | Stripe Payments | Square One Payments |
|------|-----------------|---------------------|
| Huntington Federal  Savings Bank | $   6,214.10 | $ 1,429.32 |
| Community Trust  Bank | $ 20,577.93 | $       0.00 |
| Peoples Bank | $ 80,454.72 | $       0.00 |
| First State Bank | $ 36,702.60 | $       0.00 |
| City National Bank | $ 10,000.00 | $       0.00 |
| Totals | $ 153,950.00 | $   1,429.32 |

63.  **Outgoing Wire Transfers to Nigeria:**  After receiving over $3,200,000 from victims located domestically and abroad, including across the United States, Poland, Sweden and Australia, Dudding made numerous wire transfers to a company located in Nigeria.  The source of funds Dudding used to make these wire transfers to Nigeria was the funds from the incoming wire transfers and checks Dudding received from the victims.  Nigerian companies, such as Keibler Couture Global Ltd., which maintained a bank account in Lagos, Nigeria, received Dudding's wire transfers.  These wire transfers are summarized below:

| Bank | Outgoing Wire Transfers to Nigeria |
|------|-----------------------------------|
| BB&T | $      27,900 |
| JP Morgan Chase | $ 1,038,670 |
| United Bank | $    100,500 |
| Totals | **$ 1,167,070** |

64.  Several specific examples of Dudding's wire transfers to Nigeria are listed below:

| Date | Amount | Nigerian Company |
|------|--------|------------------|
| August 17, 2018 | $3,900 | Samuel Asabia House |
| September 4, 2018 | $8,000 | UBA House |
| September 11, 2018 | $16,000 | UBA House |

16

| September 24, 2018 | $9,500 | Keibler Couture Global Ltd. |
|---|---|---|
| October 2, 2018 | $34,000 | Keibler Couture Global Ltd. |
| November 27, 2018 | $57,000 | Keibler Couture Global Ltd. |

65.     The discrepancy between the $3,200,000 received from victims and the $1,076,070 wire transfers to Nigeria can be attributed in large part to the seizure of the Subject Funds.

**DUDDING USED VICTIM FUNDS FOR HER PERSONAL EXPENSES**

66.     Dudding used over $100,000 of victim funds for her personal benefit.   For example, Dudding used the funds to pay for her utility bills, Direct TV service, groceries, drug store purchases, gasoline purchases, department store purchases, restaurants, cashed checks, and numerous cash withdrawals.  Dudding used over $40,000 of the illicit funds derived from victims in her SunTrust Account for personal expenses; over $10,000 of illicit funds derived from victims in her JP Morgan accounts for personal expenses; and over $20,000 of illicit funds derived from victims in her Huntington Federal Savings Bank accounts for personal expenses.  During the period of the scheme, Dudding's cash withdrawals total to $41,928.

**THE SUBJECT FUNDS ARE ILLICIT PROCEEDS AND WERE USED TO FURTHER THE MONEY LAUNDERING SCHEME**

**Huntington Federal Savings Bank**

67.     Huntington Federal Savings Bank, personal accounts numbers ending in 4743 and ending in 1317 were both opened on October 18, 2018, the authorized signors being Patricia Dudding and/or Roger Dudding.

17

68.    An examination of bank records demonstrated that Dudding and her co-conspirators used these accounts to promote their mail/wire fraud activities.  Based on the facts alleged above and examples of financial transactions detailed below, there is probable cause that the contents of this account contain fraudulent proceeds and that Dudding and her co-conspirators used this account to launder funds by concealing the true ownership of the funds and promote the fraudulent activities and violations of 18 U.S.C. §§ 1028A, 1341, 1343, and 1344.

69.    On May 09, 2019, Dudding deposited two cashier checks from First State Bank in Barboursville, WV ($28,767.81 and $21,371.89) into her checking account number ending in 4743, for a total deposit of $50,139.20.

70.    On May 15, 2019, Dudding requested to purchase a Huntington Federal Cashier check #338957, in the amount of $47,300 made payable to Known Person 1, residing in Montana. She paid for the cashier check from her checking account (same as above). She also requested $900 in cash from her checking account during this visit.

71.    On June 11, 2019, Dudding made a deposit into the same checking account in the amount of $98,890, with a check on her account at SunTrust Bank.

72.    On June 14, 2019, Dudding requested to send a wire in the amount of $68,920.00 from her Huntington Federal checking account to Known Person 1. The funds were wired to Known Person 1's checking account at Wells Fargo Bank in Helena, MT.

73.    Later this same day, Dudding requested to deposit another check from her SunTrust Bank in the amount of $208,276.29 into her Huntington Federal checking account.  Dudding told a bank employee that she (Dudding) has been involved in a scam with a person she met on the internet, and that the recipient of the wire, Known Person 1 was supposed to pass the

money along to an individual in Nigeria. The \$208,276.29 check from SunTrust was returned unpaid, and was charged back to Dudding's Huntington Federal checking account.

74.    Dudding admitted to investigators that she was not the true owner of the funds in the Huntington Federal Savings Bank accounts and voluntarily agreed to abandon these funds. Based on Dudding's statements, voluntary abandonment of the funds, and the government's request, Huntington Federal Savings Bank froze the contents of the two accounts listed above.

### Wesbanco Bank

75.    The Wesbanco Bank personal account number ending in 2878 was opened in August 2018.[7] An examination of bank records demonstrated that Dudding and her co-conspirators used this account to promote their mail/wire fraud activities.  Based on the facts alleged above and examples of financial transactions detailed below, there is probable cause that the contents of this account contain fraudulent proceeds and that Dudding and her co-conspirators used this account to launder funds by concealing the true ownership of the funds and promote the fraudulent activities and violations of 18 U.S.C. §§ 1028A, 1341, 1343 and 1344.

76.    This account was not used in the scheme until June 14, 2019 when Dudding wrote a check on this account for \$28,340, to pay Kembor Inc. \$28, 340.[8]  This caused a negative balance in the account of (\$32,992.91).  Dudding transferred \$45,000 from her SunTrust Account

[7]  This United States believes that this account was originally opened with Sentry Bank in 2013; however, Sentry Bank became Wesbanco Bank in 2018.

[8] Westbanco eventually stopped payment on the check.

on June 10, 2019 to cover this check.  Dudding also wrote two checks on her SunTrust account for $26,365 (check # 1030) and for $30,000 (check # 1027), both of which were deposited into DUDDING's WesBanco account on June 14, 2019. Both were returned for insufficient funds because SunTrust froze that account.

77.    Dudding admitted to investigators that she was not the true owner of the funds in the Wesbanco Bank account and voluntarily agreed to abandon these funds.  Based on Dudding's statements, voluntary abandonment of the funds, and the government's request, Wesbanco Bank froze the contents of the two accounts listed above.

**SunTrust Bank**

78.    SunTrust Bank, personal account number ending 6498 lists Patricia Dudding as the authorized signor.

79.    An examination of bank records demonstrated that Dudding and her co-conspirators used this account to promote their mail/wire fraud activities.  Based on the facts alleged above and examples of financial transactions detailed below, there is probable cause that the contents of this account contain fraudulent proceeds and that Dudding and her co-conspirators used this account to launder funds by concealing the true ownership of the funds and promote the fraudulent activities and violations of 18 U.S.C. §§ 1028A, 1341, and 1343.

80.     Dudding received three incoming wire transfers into her SunTrust bank account from a company located in Texas.  These wire transfers included a wire transfer on June 10, 2019 in the amount of $612,109.79; a wire transfer on June 17, 2019 in the amount of $462,285.00; and a wire transfer on June 24, 2019 in the amount of $866,577.78.  The investigation revealed that the email account for this Texas company had been

20

compromised and the funds involved in these three wire transfers into Dudding's account had in fact been stolen from the bank account of the Texas company. The Houston Police Department Cyber Crimes Unit is working on that investigation. Dudding voluntarily informed the government and SunTrust that she was not the true owner of the funds in the SunTrust account and abandoned the funds in the account. Based on Dudding's admissions, abandonment of the funds, and the government's request, SunTrust froze Dudding's account before Dudding could wire transfer these funds to Nigeria.

### **JP Morgan Chase Bank**

81.    Financial records have revealed that Dudding also maintains a bank account at JP Morgan Chase ending in 5372. Investigators believe that she is the only authorized signor on that account.

82.    An examination of bank records demonstrated that Dudding and her co-conspirators used this account to promote their mail/wire fraud activities. Based on the facts alleged above and examples of financial transactions detailed below, there is probable cause that the contents of this account contain fraudulent proceeds and that Dudding and her co-conspirators used this account to launder funds by concealing the true ownership of the funds and promote the fraudulent activities and violations of 18 U.S.C. §§ 1028A, 1341, and 1343.

83.    Investigators analyzed Dudding's bank account information and learned that there had been multiple financial transactions between Dudding and Grooms. Specifically, Grooms made at least four transfers into Dudding's Chase bank account that has been frozen by bank officials. The wire transfers were as follows: $38,500.00 transferred on March 13, 2019 and $19,100.00 transferred on March 20, 2019.

84.    The United States later seized the contents of this account after learning of the account's existence and the transaction history associated with this account.

## SUMMARY

85.    Dudding, Grooms, and Lucas have been involved in an international fraud since at least 2018.  The Subject Funds are composed of illegal proceeds generated from specified unlawful activity, i.e., the aforementioned mail, wire, and bank fraud activities in violation 18 U.S.C. §§ 1341, 1343 and 1344 as well as aggravated identity theft in violation of 18 U.S.C. § 1028A.

86.    Moreover, Dudding, Grooms, and Lucas laundered the illicit proceeds received from this international fraud scheme, by using the Subject Funds, in violation of 18 U.S.C. §§ 1956 (laundering of monetary instruments) and 1957 (engaging in monetary transactions in property derived from specified unlawful activity).

87.    The Subject Funds were used to conceal the proceeds of specified unlawful activities, including but not limited to, mail fraud, wire fraud, bank fraud, and aggravated identity theft, with the intent to promote the carrying on of specified unlawful activities, as well as to knowingly engage, or attempt to engage in a monetary transaction with proceeds of the specified unlawful activities in an amount greater than $10,000, by, through, or to a financial institution.   Therefore, the Subject Funds constitute property involved in a transaction or attempted transaction in violating 18 U.S.C. §§  1956-1957, or any property traceable to such property, and that said funds are subject to forfeiture under U.S.C. § 981 and/or 18 U.S.C § 982.

88.    For the foregoing reasons, the defendant properties are forfeitable to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) because the defendant proceeds are composed of

22

illicit proceeds generated from aggravated identity theft, mail, wire and/or bank fraud activities.  The defendant funds are also forfeitable to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A) because the defendant funds were also involved in monetary transactions in violation of 18 U.S.C. §§ 1956-1957 as alleged in the Complaint.

## **CLAIMS FOR FORFEITURE**

89.    The allegations contained in paragraphs 1 through 88 of this Verified Complaint for Forfeiture in Rem are incorporated herein and made a part hereof.

90.    The defendant properties and all property traceable thereto, are subject to forfeiture as property constituting, or derived from, proceeds traceable to a violation of 18 U.S.C. § 1341.

91.    The defendant properties, and all property traceable thereto, are subject to forfeiture as property constituting, or derived from, proceeds traceable a violation of 18 U.S.C. § 1343.

92.    The defendant properties, and all property traceable thereto, are subject to forfeiture as property constituting, or derived from, proceeds traceable to a violation of 18 U.S.C. § 1344.

93.    The defendant properties, and all property traceable thereto, are subject to forfeiture as property constituting, or derived from, proceeds traceable to a violation of a 18 U.S.C. § 1028A.

94.    The defendant properties, and all property traceable thereto, are also subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1) as property involved in money laundering transactions or attempted transactions in violation of 18 U.S.C. § 1957.

23

95.     As a result of the foregoing, the defendant properties and all property traceable thereto are

subject to condemnation and to forfeiture to the United States, in accordance with 18

U.S.C. §§ 981(a)(1)(a) and 981(a)(1)(C).

## CONCLUSION

96.     By virtue of the foregoing and pursuant to 18 U.S.C. § 981(f), all right, title and interest in

the defendant properties vested in the United States at the time of the commission of the

unlawful acts giving rise to forfeiture has become and is forfeitable to the United States.


WHEREFORE, the United States requests that notice of this action be given to all persons

who reasonably appear to be potential claimants to the defendant property; that judgment be

entered declaring the defendant properties to be forfeited and condemned to the United States of

America for disposition according to law; that plaintiff be awarded its costs and disbursements in

this action; and that the Court award such other and further relief as it deems proper and just,

including but not limited to expenses of maintenance and protection of the defendant properties as

required by 28 U.S.C. § 1921.

Respectfully submitted

MICHAEL B. STUART
United States Attorney


By:          /s/Kathleen E. Robeson
             Kathleen E. Robeson
             Assistant United States Attorney
             VA State Bar No. 89526
             300 Virginia Street, East, Suite 4000
             Charleston, WV  25301
             Telephone:  304-345-2200
             Fax:  304-347-5104
             E-mail:  Kathleen.robeson@usdoj.gov

## **VERIFICATION**

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, TO-WIT:

I, Terry S. Hedrick, an agent with the United States Secret Service declare under penalty of perjury as provided by 28 U.S.C. § 1746, the following:

That the foregoing Complaint for Forfeiture in rem is based upon reports and information I personally have prepared or gathered and which have been provided to me by various law enforcement personnel, and that everything contained therein is true and correct to the best of my knowledge and belief, except where stated to be upon information and belief, in which case I believe it to be true.

Executed on January 17, 2020.

_____
TERRY S. HEDRICK

Taken, subscribed and sworn to before me this 17th day of January, 2020.



_____
Notary Public

My commission expires on April 24, 2023.

JS 44  (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS  All Funds in the Bank Account in the name of

Approx. $29,781.79 seized from Huntington Federal Savings Bank Acct. Nos. ending in 4743 and 1317, et al.

County of Residence of First Listed Defendant    Cabell
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government Plaintiff

☐ 2   U.S. Government Defendant

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☒ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. 981(a)(1)(A) and (C)

Brief description of cause:
Civil Forfeiture of Bank Accounts seized as proceeds of identity theft, fraud and illegal monetary transactions

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
1,760,589.24

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE  1/21/2020

SIGNATURE OF ATTORNEY OF RECORD  *Kathleen Robeson*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____